IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| CHARLES A. COLOSIMO, SR., <br><br> Plaintiff, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | No. 4:08-CV-00397 <br><br><br> **ORDER** |
| CHARLES A. COLOSIMO and <br> CAROLYN COLOSIMO, <br><br> Defendants on Counterclaim. | |

## I. PROCEDURAL BACKGROUND

A. Pleadings

On January 1, 2007, the IRS assessed trust fund recovery penalties of $711,234.82 against Charles Colosimo ("Colosimo"), Carolyn Colosimo ("Carolyn"), and Andrew Gillaspey ("Gillaspey") pursuant to 26 U.S.C. §§ 6671 and 6672.  On September 19, 2008, Colosimo filed a Claim for Refund and Abatement with the IRS in Minneapolis, requesting a refund of the trust fund recovery penalty of $100 for the 12/31/01 quarter. The United States denied this claim for refund and abatement [See Dkt. 1, Form 843].  On September 26, 2008, Colosimo brought an action against the United States to abate the trust fund recovery penalty and refund all amounts withheld by the United States from him, alleging that the IRS improperly assessed the penalty against him [Dkt. 1].

On November 26, 2008, the government filed an answer to Colosimo's complaint [Dkt. 2].  The government further brought a counterclaim against Colosimo, joining Carolyn and Gillaspey as defendants on the counterclaim.  The government brought the

counterclaim pursuant to 26 U.S.C. § 7401 to reduce to judgment separate federal tax assessments made against the three, alleging that each counterclaim defendant, as a responsible person within C&C Distribution Services, Inc. ("C&C Distribution"), willfully failed to pay over withheld income and FICA taxes to the United States. On December 9, 2008, the government dismissed the counterclaim against Gillaspey, leaving only Colosimo and Carolyn as counterclaim defendants [Dkt. 5].

On December 15, 2008, Colosimo and Carolyn filed a joint answer to the counterclaim, denying most of the allegations and asserting affirmative defenses [Dkt. 6]. In particular, they asserted that neither of them were "responsible parties" within C&C Distribution, and neither willfully failed to pay, collect, or truthfully account for the withheld taxes.

B. Motions before the court

1. Carolyn's motion for summary judgment and Colosimo's motion to strike

On October 28, 2009, Carolyn filed a motion for summary judgment [Dkt. 12], arguing that she was not a "responsible person" under 26 U.S.C. § 6672. On November 23, 2009, the government filed a response to Carolyn's motion, arguing that whether Carolyn was a "responsible person", and whether she willfully failed to pay over withheld taxes, presented genuine issues of material fact [Dkt. 15]. In support of the argument that Carolyn was a "responsible person", the government cited a declaration by IRS representative Rebecca Denning ("Denning") that Carolyn had told Denning that Carolyn had the authority at C&C Distribution to prepare, review, sign, and transmit payroll tax returns [Dkt. 15, Appendix, at 260-61].

On December 4, 2009, Carolyn filed a reply to the government's response, conceding that a genuine issue of fact would exist on the willfulness issue, but contesting the government's argument that there are genuine issues of material fact on the threshold issue of whether Carolyn is a "responsible person" [Dkt. 21]. In addition, Carolyn argued

that statements in Denning's declaration should be stricken under the "sham affidavit" doctrine, and asked for an award of attorneys' fees for filing the brief under the same doctrine. On December 11, 2009, the government filed a surreply to Carolyn's reply, requesting that the court find that it did not submit a "sham affidavit" and that Carolyn must bear her own attorneys' fees for her reply brief [Dkt. 25]. On December 28, 2009, Carolyn filed a reply to the government's surreply [Dkt. 30].

Meanwhile, on December 10, 2009, Colosimo filed a related motion to strike Rebecca Denning's Declaration – and the government's Statement of Additional Material Facts that relied on it – based on the "sham affidavit" doctrine [Dkt. 24]. The government filed a reply to Colosimo's motion to strike on December 23, 2009, arguing that the portion of Denning's declaration objected to does not affect Colosimo's position in this litigation, as it only relates to Carolyn [Dkt. 29].

### 2. Colosimo's and the government's cross-motions for summary judgment

On December 1, 2009, Colosimo and the government each filed motions for summary judgment against one another [Dkts. 18 and 19, respectively]. Charles argues that he is not a responsible party for C&C Distribution and did not willfully fail to pay over withholding taxes to the United States. On December 23, 2009, the government filed a response to Colosimo's motion for summary judgment [Dkt. 27], and on January 4, 2010, Colosimo filed a reply [Dkt. 32]. On December 28, 2009, Colosimo filed a response to the government's motion for summary judgment [Dkt. 31], and on January 7, 2010, the government filed a reply [Dkt. 33].

In accordance with the reasoning below, the court rules as follows:

(i) Carolyn's motion for summary judgment is granted;

(ii) Carolyn's request for attorneys' fees is denied;

(iii) Colosimo's motion to strike is denied;

(iv) Colosimo's motion for summary judgment is denied; and

(v) the government's motion for summary judgment against Colosimo is granted.

## II. MOTION FOR SUMMARY JUDGMENT – THE LEGAL STANDARD

A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. HDC Med., Inc., v. Minntech Corp., 474 F.3d 543, 546 (8th Cir. 2007) (citation omitted); see also Kountze ex rel. Hitchcock Found. v. Gaines, 536 F.3d 813, 817 (8th Cir. 2008) ("[S]ummary judgment is appropriate where the pleadings, discovery materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.").

Once the movant has properly supported its motion, the nonmovant "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). "[A]n issue of material fact is genuine if the evidence is sufficient to allow a reasonable jury verdict for the nonmoving party." Great Plains Real Estate Dev., L.L.C. v. Union Cent. Life Ins. et al., 536 F.3d 939, 944 (8th Cir. 2008) (citation omitted). "A genuine issue of fact is material if it 'might affect the outcome of the suit under the governing law.'" Saffels v. Rice, 40 F.3d 1546, 1550 (8th Cir. 1994) (citation omitted). The nonmoving party is entitled to all reasonable inferences that can be drawn from the evidence without resort to speculation. Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1110 (8th Cir. 2001). "[A]lthough [the non-moving party] does not have to provide direct proof that genuine issues of fact exist for trial, the facts and circumstances that she [or he] relies 'upon must attain the dignity of substantial evidence and not be such as merely to create a suspicion.'" Taylor v. White, 321 F.3d 710, 715 (8th Cir. 2003) (citation omitted). The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the

plaintiff.  <u>Sprenger</u>, 253 F.3d at 1110.

# III. UNDISPUTED FACTS

## A. C&C Distribution in general

C&C Distribution leased storage space and operated truck delivery services.  It had over thirty employees.  Colosimo, Carolyn, and Gillaspey were officers and/or employees of C&C Distribution from 2001 to 2004.  Colosimo and Carolyn's son, Charles Colosimo, Jr. ("Charles, Jr.") was also involved with the company.  Between 2000 and 2004, C&C Distribution failed to pay over to the United States the income and employment taxes withheld from the wages of its employees.  The IRS determined that Colosimo, Carolyn, and Gillaspey were responsible for collecting, truthfully accounting for, and paying over those withheld income and employment taxes but willfully failed to do so.

Between 2001 and 2004, Colosimo and Carolyn collectively owned 100 percent of the stock in C&C Distribution; each owned 50 percent.  The Colosimos also co-owned an entity named C&C Realty.  Between 2001 and 2004, C&C Distribution rented space in two warehouses owned by C&C Realty, and Colosimo signed the lease agreements between C&C Distribution and C&C Realty.  Taken together, these leases obligated C&C Distribution to pay over $56,000 per month to C&C Realty.  Between 2001 and 2004, C&C Distribution accrued a debt of over $500,000 to C&C Realty for unpaid rent.

Forms 941 are federal withholding tax returns.  C&C Distribution did not file Forms 941 for any quarter of 2001, 2002, 2003, or 2004 prior to June 1, 2004.  Colosimo signed C&C Distribution's Forms 941 for the quarters ending September 30, 2004 and December 31, 2004, and Gillaspey signed C&C Distribution's federal income tax returns for the years 2001 through 2004.

Between 2001 and 2004, Wendy Wiedner ("Wiedner") was C&C Distribution's outside accountant.  When Wiedner learned of C&C Distribution's large unpaid tax liability in June 2004, she met with Colosimo and Gillaspey.  After June 4, 2004,

Colosimo and Carolyn were undisputedly aware of C&C Distribution's unpaid federal tax liability.

C&C Distribution disbursed funds at least through December 30, 2005 from a Meta Bank/Iowa Savings Bank account held in its name, though C&C Distribution ceased operating its delivery and storage services in early September 2004. Between June 4, 2004 and Labor Day 2004, C&C Distribution disbursed funds totaling $902,084.99 to creditors other than the United States. Between June 4, 2004 and December 31, 2005, C&C Distribution disbursed funds totaling $1,645,512.81 to creditors other than the United States. Between June 4, 2004 and December 31, 2004, C&C Distribution paid $317,272 to C&C Realty. Colosimo stated in his deposition that although he does not recall approving the transfer of assets from C&C Distribution to C&C Realty, he is sure that he would have approved the transfer.

In April or June 2006, Colosimo and Carolyn met with IRS Representative Rebecca Denning regarding the unpaid tax liabilities of C&C Distribution.

B. Gillaspey's role in C&C Distribution

Gillaspey was the bookkeeper of C&C Distribution. He was responsible for preparing the company's financial statements. He also managed dispatchers and truck drivers. Gillaspey had the password to the Electronic Funds Transfer System ("EFTS") that C&C Distribution would have used to pay payroll taxes, had it paid them. During the period 2001 through 2004, Gillaspey prepared reports of creditors to pay, and omitted from these reports the payroll taxes that C&C Distribution owed to the United States. Gillaspey was never instructed by Colosimo or anyone at C&C Distribution to hide the unpaid payroll tax liability, to hide the payroll liability from C&C Distribution's CPA, or not make the payments of trust fund taxes.

Gillaspey prepared all the checks that Colosimo would sign on behalf of C&C Distribution. Gillaspey also prepared and signed C&C Distribution's Forms 941 for

various quarters from 2001 to 2004. For other quarters during that time period, Gillaspey prepared them with CPA Pamela Schneider in August of 2005 and signed them then. Gillaspey had informed the outside accountants to C&C Distribution – primarily Wendy Wiedner – that he had filed all Forms 941 for C&C Distribution prior to June 1, 2004, but this was false.

Gillaspey was responsible for paying over C&C Distribution's withheld taxes.

C. Colosimo's role in C&C Distribution

Colosimo was president and treasurer of C&C Distribution between 2001 and 2004. He was also a member of C&C Distribution's board of directors, and was a 50 percent shareholder. Colosimo had the authority to hire and fire employees. He had check-signing authority on all of C&C Distribution's accounts, and exercised that authority by signing checks on behalf of C&C Distribution. He claims he was the only person at C&C Distribution who had the authority to borrow money on the company's behalf between 2001 and 2004. Colosimo authorized C&C Distribution to borrow money from State Savings Bank on at least four occasions during 2003 and once during 2004. During 2003 and 2004, Colosimo pledged his own personal assets to guarantee four loans from State Savings Bank.

He signed C&C Distribution's federal income tax returns for the years 2001, 2002, 2003, and 2004; these returns provide specific information on the amount of unpaid payroll taxes that C&C Distribution owed the United States. He signed some of C&C Distribution's Form 941 tax returns for 2004. He often reviewed a report listing creditors prepared by Gillaspey, and from that list determined which creditors to pay. The liability for accrued payroll taxes was not listed on that report due to manipulation by Gillaspey.

Colosimo's role as president and treasurer was that of an overseer of the different components of C&C Distribution. Colosimo did not know the password to the EFTS system. Colosimo did not have the technical knowledge to pay the payroll taxes through

the EFTS.

In November 2003, Colosimo received IRS notices informing him that C&C Distribution had not filed a federal unemployment tax return (Form 940) for 2001 and had not filed federal employment tax returns (Forms 941) for various quarters in 2000, 2001, and 2002.   Colosimo faxed these notices to C&C Distribution's accountant Wendy Wiedner soon thereafter.   After reviewing these notices, Wiedner called Colosimo to discuss them; Wiedner thought there was a bureaucratic mix-up with an ID number.

Colosimo claims that he first learned of C&C Distribution's unpaid federal tax liabilities on June 4, 2004.   Colosimo spoke by phone and met with Wiedner about C&C Distribution's unpaid federal tax liabilities during June 2004 and after.

D. Carolyn's role in C&C Distribution

Carolyn was a director, Vice President, Secretary, and 50 percent shareholder in C&C Distribution during 2001 to 2004.   Carolyn spent less than ten hours per week at C&C's offices, where she answered telephone calls, signed checks when directed by Colosimo, and filled in for secretaries as needed.   The by-laws of C&C state the duties of the Vice President and Secretary as follows:

Powers and Duties of the Vice-Presidents.

In the absence of the President or in the event of the President's death, inability or refusal to act, the Vice-President (or if more than one), the senior Vice-President in length of service shall perform the duties of the President, and when so acting, shall have all powers of and be subject to all restrictions upon the President.   Each Vice-President shall perform such duties and have such authority as may be assigned to such Vice-President by the President or by the Board.

Power and Duties Of the Secretary.

The Secretary shall (a) keep minutes of all meetings; (b) attend to serving all notices of the Corporation; (c) be custodian of the corporate seal, if any, the stock certificate books and such other books, records and papers as the

8

Board directs; (d) keep a stock record showing the names of all shareholders, their post office addresses as furnished by them, and the shares of stock held by them, and at least ten days before each shareholders' meeting, prepare a list of shareholders entitled to vote thereat arranged in alphabetical order; (e) sign in the name of the Corporation all contracts authorized by the Board or the President; and (f) in general all duties incident to the office and such other duties as may be assigned by the President or the Board.

Carolyn did not have the power at C&C Distribution to hire or fire employees.

Carolyn was authorized to sign checks on behalf of C&C between 2001 and 2004, and she in fact signed C&C Distribution checks, including payroll checks, during that time period. Carolyn wrote out by hand numerous checks to C&C Distribution Services creditors and employees, during a two or three week period in September 2004.

On March 5, 2003, Carolyn guaranteed a loan from State Savings Bank to C&C Distribution. On June 30, 2003, she personally guaranteed a promissory note that C&C Distribution executed in the event State Savings Bank had to make payments on a letter of credit extended on C&C Distribution's behalf to an insurance company. On December 29, 2004, Carolyn signed a debt settlement agreement between State Savings Bank, herself, Colosimo, C&C Distribution, C&C Transportation Co., Inc., and C&C Realty, in which she warranted and agreed that she gave the personal guarantees mentioned above. As part of the debt settlement agreement, Carolyn agreed to pay C&C Distribution's debts to State Savings Bank out of her personal assets and the assets of C&C Realty.

Carolyn learned of C&C Distribution's unpaid federal tax liability on June 4, 2004. After that time, she attended meetings with C&C Distribution's accountant Wendy Wiedner. Between June 4, 2004 and December 31, 2004, Carolyn signed eight checks from C&C Distribution to C&C Realty totaling $120,372. Between December 31, 2004 and December 31, 2005, Carolyn signed two similar checks totaling $35,023.09.

## IV. CONCLUSIONS OF LAW

Federal law requires employers to withhold income, Social Security and Medicare tax from their employee's wages at the time that the wages are paid to the employees. 26 U.S.C. §§ 3101; 3102(a), (b); 3402; 3403; <u>Honey v. United States</u>, 963 F.2d 1083, 1087 (8th Cir. 1992). The withheld taxes are held in trust by the employer, to be remitted to the IRS at the appropriate intervals. 26 U.S.C. § 7501. Because the withheld taxes are held in trust by the employer, the funds may not be used for any other purpose. <u>Slodov v. United States</u>, 436 U.S. 238, 243 (1978). If the employer misuses the funds and is unable to pay the money to the government, the individual employee is given credit for paying the taxes. <u>Id.</u> at 943. Under 26 U.S.C. § 6672, however, the government can pursue the company or its officers individually for the unpaid taxes, penalties and interest.

> Title 26 U.S.C. § 6672 states:
>
> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672 (2006). Under 26 U.S.C. § 6671(b), "person" is defined to "include[] an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." 26 U.S.C. § 6671(b)(2006). To incur liability under § 6672, "an individual must be a responsible person and must willfully fail to pay over the taxes in question." <u>Ferguson v. United States</u>, 484 F.3d 1068, 1072 (8th Cir. 2007) (citation omitted). "A responsible person is someone who has the status, duty and authority to avoid the corporation's default in collection or payment of the taxes." <u>Id.</u> (citations and quotation marks omitted).

10

In determining if someone is a "responsible person" within a company, courts consider, with no one factor determinative, whether: (1) she is an officer or member of the board of directors; (2) she owns a substantial amount of stock in the company; (3) she manages the day-to-day operations of the business; (4) she has the authority to hire and fire employees; (5) she makes decisions as to the disbursement of funds and payment of creditors; and (6) she possesses the authority to sign company checks. Ferguson v. United States, 343 F.Supp.2d 787, 798 (S.D. Iowa 2004) (quoting Barnett v. IRS, 988 F.2d 1449, 1455 (5th Cir. 1993)), aff'd, 484 F.3d 1068 (8th Cir. 2007); see also Moulton v. United States, 429 F.3d 352, 356 (1st Cir. 2005) (recognizing as indicia of responsibility "the holding of corporate office, control over financial affairs, the authority to disburse corporate funds, stock ownership, and the ability to hire and fire employees); Thosteson v. United States, 331 F.3d 1294, 1299 (11th Cir. 2003) (same); Smith v. United States, 555 F.3d 1158, 1163 (10th Cir. 2009) (same).

Ultimately, tracking the requirements of § 6672, "[t]he test is whether the person had control of the disbursements of the taxpayer, that is, whether he had the final word as to what bills should or should not be paid, and when." Anderson v. United States, 561 F.2d 162, 165 (8th Cir. 1977) (citations and quotation marks omitted). However, this control can be exercised jointly with others. Id. (citations omitted). "It suffices that the person have significant control (not necessarily sole or final authority) over disbursement of the trustee's funds." Donelan Phelps & Co., Inc. v. United States, 876 F.2d 1373, 1376 (8th Cir. 1989).

A. Carolyn's motion for summary judgment and Colosimo's motion to strike

*1. The parties' arguments*

Carolyn argues that she was not a "responsible person" under 26 U.S.C. § 6672 or indeed even a "person" under 26 U.S.C. § 6671(b). These amount to the same inquiry – namely, whether she was under a duty to collect, account for, and pay over to the United

States the withholding taxes of C&C Distribution. She argues that she did not have such a duty, as she did not have significant control over the disbursement of C&C Distribution's funds. She asserts that she had no responsibility for C&C Distribution's payroll taxes. Her main argument is that, though she did all the things recounted above – including signing checks and guaranteeing a loan for C&C Distribution – she did them only at the direction of Colosimo.

She asserts that the operation of C&C Distribution was in the hands of Colosimo and Gillaspey, who performed – without her – the following functions:

- hiring/firing employees
- managing employees
- directing or authorizing payment of bills
- dealing with major suppliers and customers
- negotiating large corporate purchases, contracts, and loans
- opening/closing corporate bank accounts
- making/authorizing bank deposits
- authorizing payroll checks
- preparing federal payroll tax returns
- authorizing payment of federal tax deposits
- reviewing federal income tax returns

She asserts that Colosimo, Charles, Jr., and Gillaspey determined which creditors should be paid, based on a list prepared by Gillaspey, and that Gillaspey prepared all payroll checks. She says that she only signed C&C Distribution checks, including payroll checks, when directed to do so by Colosimo. She cites the depositions of Gillaspey, Colosimo, and Wiedner – C&C Distribution's outside accountant – who all specifically testified that she had no responsibility for C&C Distribution's federal withholding taxes. Carolyn argues that she clearly did not have "significant control" over C&C Distribution's payment of withholding taxes, based on the affidavits of Gillaspey, herself, Colosimo, and Charles, Jr., and, in addition, Wiedner's deposition testimony that Carolyn had nothing to do with C&C Distribution's payroll taxes.

12

The government argues that whether Carolyn was a responsible person presents a genuine issue of material fact.[1]  The government asserts that Carolyn had "significant control" over C&C Distribution's financial affairs.  The government points to Carolyn's corporate positions, fifty percent ownership interest, check-writing, check-signing, and use of personal funds to obtain and repay loans for C&C Distribution.  The government points in particular to the fact that Carolyn signed checks, and that she wrote out numerous checks by hand to C&C Distribution's creditors and employees.  The government asserts that this casts doubt on Carolyn's claim to have only signed checks that Colosimo instructed her to sign.  Carolyn responds that this was an exceptional circumstance in which Gillaspey directed her to prepare checks from a list Gillaspey provided during a two-week period in September 2004, citing affidavits by Gillaspey, Colosimo, and herself.  Carolyn says her ability to write checks was limited to this two week period due to a change in bank accounts.

The government also points to Carolyn's role in C&C Distribution's acquisition of funds – pledging her personal property to secure loans used to run C&C Distribution, guaranteeing a loan from State Savings Bank to C&C Distribution, and personally guaranteeing a promissory note that C&C Distribution executed.  The government also argues that Carolyn was involved in addressing C&C Distribution's unpaid tax liabilities.  The government asserts that Carolyn was one of three C&C Distribution employees who met with the company's outside accountant, Wendy Wiedner, to discuss the unpaid tax liabilities after June 4, 2004.

Most controversially – and most significantly if true – the government asserts that Carolyn told IRS representative Denning that Carolyn had the authority at C&C Distribution to prepare, review, sign, and transmit payroll tax returns, relying on

---

[1] Carolyn concedes that there would be a genuine issue of material fact on the willfulness issue if she is a responsible person.

13

Denning's declaration.  Carolyn disputes this, citing an affidavit of C&C Distribution's corporate counsel, Thomas Flynn, stating that Carolyn told Denning only that Carolyn signed checks at the direction of Colosimo, and that no one told Denning that Carolyn prepared, signed, or transmitted payroll tax returns.

### 2. The sham affidavit doctrine

Indeed, Carolyn argues that Denning's declaration is contrary to her prior sworn testimony and should be stricken under the "sham affidavit" doctrine.  "Parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment."  American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc., 114 F.3d 108, 111 (8th Cir. 1997).  "Ambiguities and even conflicts in a deponent's testimony are generally matters for the jury to sort out, but a district court may grant summary judgment where a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before."  Id. (quoting Wilson v. Westinghouse Elec. Corp., 838 F.2d 286, 289 (8th Cir. 1988)).  "Otherwise, any party could head off a summary judgment motion by supplanting previous depositions ad hoc with a new affidavit, and no case would ever be appropriate for summary judgment."  Id.  To the extent that the affiant's affidavit conflicts with his earlier deposition testimony, his affidavit testimony should be disregarded.  Plymouth Foam Prods., Inc. v. City of Becker, 120 F.3d 153, 155 n.3 (8th Cir. 1997).  However, where the affidavit testimony seems consistent with the affiant's prior deposition testimony, or simply adds more detailed information, the court may properly consider the affidavit on summary judgment.  Bass v. City of Sioux Falls, 232 F.3d 615, 618 (8th Cir. 1999).

Here, Denning testified about an interview she conducted on April 20, 2006 of Colosimo and Carolyn, with their attorney Thomas Flynn.  She said she completed a Form 4180 during the interview, entitled "Report of Interview with Individual Relative to Trust Fund Recovery Penalty or Personal Liability for Excise Tax."  That form reflects that

14

Denning listed both Colosimo and Carolyn in the category of who prepared, reviewed, signed, and transmitted payroll tax returns, though Denning did not mention this as a reason to believe Carolyn was responsible for payroll taxes in her deposition.  At her deposition on October 29, 2009, Denning testified as follows:

> Q:    So what evidence do you have that Carolyn Colosimo was a responsible person, other than that she was a 50 percent stockholder, she was a director, she was the vice president and secretary, she could sign checks of C&C Distribution Services, she could guarantee a loan?  What other information do you have that determine – to make your determination that she was a responsible person?
>
> > Mr. Fay: Jim, are you asking at the time she made the assessment or sitting in this deposition?
> >
> > Mr. Monroe: At the time she made the determination.
>
> A:    Besides what you've just mentioned?
>
> Q:    Besides what I've just mentioned.
>
> A:    She signed a debt forgiveness agreement.  Did you say that?  Maybe you said that.
>
> Q:    Was she personally liable on the debt?
>
> A:    I believe they personally guaranteed –
>
> Q:    So she would've had to sign it anyway?
>
> A:    Right.
>
> Q:    Personally?
>
> A:    Right.  I think that's about it.
>
> Q:    That was as of the date you made your determination?
>
> A:    Uh-huh.
>
> Q:    What information do you have, as you sit here today, that she's a responsible person in addition to what you've already testified to?
>
> > Mr. Fay: And, again, same objection as to what's beyond the scope–
>
> A:    I don't gather information after I close my case.
>
> Q:    So you have no additional information?
>
> A:    No.

In her subsequent declaration dated November 19, 2009, Denning stated:

During the April 20, 2006 interview, Charles and Carolyn Colosimo told me that Carolyn Colosimo could guarantee or co-sign loans for C&C Distribution, that she could sign or counter-sign checks, that she could

authorize or sign payroll checks, and that she could prepare, review, sign
and transmit payroll tax returns.

Carolyn argues that the last phrase here – that Carolyn told Denning that Carolyn could
prepare, review, sign, and transmit payroll tax returns – conflicts with Denning's prior
sworn deposition testimony that, in addition to what she had said previously, Denning had
no further information that Carolyn was a responsible person.  The government counters
that there is no conflict, as Denning's prior testimony included this information suggesting
Carolyn's responsibility insofar as her prior testimony alluded to the Form 4180 which
included this information.   At any rate, says the government, it had disclosed this
information to Carolyn in interrogatories before Denning's testimony.

Denning's affidavit is not a sham affidavit, created merely to head off summary
judgment.  Indeed, the document on which it is based – the Form 4180 – predates the
motion for summary judgment.  Moreover, this is far from the "sudden and unexplained
revision of testimony" required for a sham affidavit.  Instead, the affidavit clarifies
Denning's earlier testimony, adding more detailed information to it.  Denning appears to
have forgotten this specific piece of information during her testimony, and her assertion
that she lacked further information does not render any subsequent disclosure of
information – especially one already known to the opposing party through interrogatories
– inconsistent with her testimony.  The court will not strike Denning's declaration, and
Carolyn is not entitled to attorneys' fees for her reply brief under the sham affidavit
doctrine.

For the same reasons, the court also denies Colosimo's motion to strike Denning's
declaration and the government's Statement of Additional Material Facts which relies on
it.  Moreover, the court notes that the paragraph of Denning's declaration which Colosimo
presumably objects to as a sham does not relate to his position in this litigation.

*3. Whether Carolyn was a responsible person*

16

Applying the relevant factors in a light most favorable to the government, there is no genuine issue of material fact as to whether Carolyn was a "responsible person" under 26 U.S.C. § 6672. She was not.

Carolyn was a 50 percent stockholder, director, vice president and secretary of C&C Distribution. But corporate titles alone do not make the officer a responsible person. See United States v. Bisbee, 245 F.3d 1001, 1007-08 (8th Cir. 2001) (citing Barton v. United States, 988 F.2d 58, 60 (8th Cir. 1993) ("Government placed unwarranted reliance on Barton's corporate titles, limited management and supervisory powers, and restricted signature authority")). Moreover, nothing in the corporate bylaws would have given Carolyn the power to decide how to disburse company funds.

Carolyn could also sign, and occasionally wrote, checks. However, all the evidence in the record suggests she did this at the direction of Colosimo and Gillaspey. Both Gillaspey and Carolyn testified that this was the case. The government provided no evidence to the contrary. Instead, the government points to the fact that Carolyn wrote out some of the checks by hand, asking the court to speculate that this meant Carolyn decided who to pay. In light of all the evidence to the contrary and Carolyn and Gillaspey's consistent explanations that she wrote checks out by hand only during a limited time period under limited circumstances, this is not an inference the court can make without resort to speculation. Technical signature authority is not the same as having the effective power to pay. See Kenagy v. United States, 942 F.2d 459, 464-66 (8th Cir. 1991); Barton, 988 F.2d at 59 (counseling against reliance on officer's corporate status and "mechanical functions" if it is beyond dispute that the officer lacks tax-paying authority).

Carolyn also guaranteed a loan and a promissory note, and signed a debt reduction agreement. But again, all the evidence in the record suggests she did this at the direction of Colosimo, and the government set forth no specific facts suggesting otherwise. The government cites cases for the proposition that even if Colosimo directed her to perform

17

these actions, that would not absolve her of liability.  However, the cases the government cites stand more precisely for the proposition that, where a person is otherwise responsible, the fact that she acted pursuant to direction from superiors does not absolve the person of liability.  Here, Carolyn is not otherwise responsible, and thus these cases do not vitiate the importance of Colosimo's close direction of Carolyn's activities.  See Smith, 555 F.3d at 1164 (holding only that one corporate officer's greater control over payments to creditors does not free from responsibility another corporate officer with significant control); Roth v. United States, 779 F.2d 1567, 1572 (11th Cir. 1986) (finding that "no instruction by the president or the majority owner of [the employer] could effectively bar an otherwise responsible officer from paying these funds in accordance with the law"); Jay v. United States, 865 F.2d 1175 (10th Cir. 1989) (reversing the district court's finding that company manager was responsible person as a matter of law where his only defense was superior orders).

All the other factors point against Carolyn's qualification as a responsible person. It is undisputed that she did not have the authority to hire and fire.  It is undisputed that she spent less than ten hours a week at C&C Distribution.  In light of these undisputed facts, she could not have managed the day-to-day operations of C&C Distribution.

The factor that the Eighth Circuit has emphasized and that most closely tracks the language of § 6672 – whether she had control over which creditors the company paid – emphatically shows that Carolyn was not a responsible person.  Four people familiar with C&C Distribution – Gillaspey, Colosimo, Charles, Jr., and C&C Distribution's outside accountant Wendy Wiedner – corroborated Carolyn's testimony that she had no responsibility for C&C Distribution's payroll taxes.  Gillaspey, Colosimo, Charles, Jr., and Carolyn all said that she did not make any decisions regarding which creditors would be paid and which ones would not be paid, and Gillaspey said she was not involved in the financial decisions of the company.  The government presented no evidence that Carolyn

18

made decisions regarding the disbursement of C&C Distribution's funds.

With regard to payroll taxes specifically, Carolyn testified that she did not know what a Form 941 was, and she, Colosimo, and Gillaspey said she does not know how to use a computer. Gillaspey prepared Forms 941, and signed Forms 941 during 2001 to June 2004, and Colosimo signed Forms 941 for the quarters ending September 30, 2004 and December 31, 2004. The government provided no evidence that Carolyn had anything to do with Forms 941.

Denning's declaration – based on what she wrote down, which in turn was based on what she heard – made up the only evidence the government provided against the masses of evidence that Carolyn had no responsibility for payroll taxes. The information in Denning's declaration, which she omitted from her own testimony, and which starkly contrasted the testimony of multiple other witnesses, is a mere "scintilla of evidence" which does not preclude summary judgment here. Sprenger, 253 F.3d at 1110.

Cases that the government cites where the officer was held to be a "responsible person" involve officers with clearly more responsibility and tax sophistication than Carolyn. See, e.g., Howard v. United States, 711 F.2d 729 (5th Cir. 1983) (officer and director who ran day-to-day operations, hired and fired, sometimes determined which bills to pay, and was sole signer on company's main account, was responsible person); Hartman v. United States, 538 F.2d 1336, 1344-45 (8th Cir. 1976) (jury was free to find officer was responsible person where officer was a former accountant familiar with withholding tax laws and signed Forms 941 and income tax returns).

Where, as here, the government has provided no evidence that a company officer decided which creditors to pay, and virtually no evidence that she had any responsibility for payroll taxes, the evidence is not sufficient to permit a reasonable jury verdict that she had "significant control" over disbursement of C&C Distribution's funds. The court finds that Carolyn was not a responsible person as a matter of law.

19

Carolyn's motion for summary judgment is granted.B. Colosimo's and the government's cross-motions for summary judgment

### 1. Charles in Charge: whether Colosimo was a responsible person

Colosimo argues that he was not under a duty to collect and pay over taxes because "he was divested of that duty through the financial manipulation of Gillaspey." Indeed, the undisputed facts reflect that Colosimo determined which creditors to pay from reports prepared by Gillaspey, who omitted from those reports payroll taxes owed to the United States. Colosimo argues that he was therefore relieved of any duty to collect and pay over those taxes.

In response, the government argues that the issue of knowledge of the unpaid tax liabilities is wholly irrelevant to the responsibility inquiry. The government argues additionally that Colosimo was under a duty to pay over the taxes withheld from C&C Distribution employees' wages because he was actively and intimately involved with C&C Distribution's finances. The government points out that Colosimo was president and treasurer, a member of the Board of Directors, and a 50% shareholder. The government notes that Colosimo had check-signing authority and exercised that authority. Moreover, Colosimo also decided which creditors the company would pay, and had the authority to hire and fire. The government also points to Colosimo's signature on C&C Distribution's federal income tax returns, his interactions with C&C Distribution's accountant Wendy Wiedner regarding unpaid tax liabilities, and his authority to borrow money and make large expenditures on the company's behalf.

The court notes at the outset that Colosimo's argument only applies to the time period preceding June 4, 2004, when Colosimo admits he learned of the unpaid tax liabilities. Colosimo cannot dispute that he was a responsible person after that time.

But even before June 4, 2004, applying the relevant factors in a light most favorable to Colosimo, there still is no genuine issue of material fact as to whether he was a

responsible person.  He was.  Every factor supports this conclusion.  President, treasurer, director, and 50 percent shareholder, Colosimo also had check-signing authority and the power to hire and fire.  An overseer of C&C Distribution's operations, Colosimo clearly managed the day-to-day operations of the business.  Moreover, it is undisputed that Colosimo made decisions as to the disbursement of funds and payment of creditors.  In these circumstances, it is clear that Colosimo was a responsible person as a matter of law.  See Ferguson, 484 F.3d at 1073 (upholding summary judgment for government on issue of responsibility where company officer was CFO and COO, signed checks, disbursed funds, and admitted he had the authority to pay the taxes without board approval); Jenson v. United States, 23 F.3d 1393, 1395 (8th Cir. 1994) (founder, president, director, with authority to hire and fire and sign checks, who regularly dealt with all major financial issues, is responsible person as a matter of law); Kizzier v. United States, 598 F.2d 1128, 1132 (8th Cir. 1979) (upholding district court finding that corporate officer who possessed significant authority in the general management and fiscal decisionmaking of the corporation was a responsible person).

Against this, Colosimo argues only that Gillaspey's admitted malfeasance with C&C Distribution's books rendered him ignorant of any unpaid tax liability, and thus he could not be responsible for it.[2]  But "[k]nowledge that taxes are unpaid is only relevant to the issue of willfulness once a person is found responsible." Barton, 988 F.2d at 60 (citing Godfrey v. United States, 748 F.2d 1568, 1576 (Fed. Cir. 1984)).  Indeed, while "knowledge of nonpayment may be relevant to the issue of willfulness . . . it is irrelevant in considering the question of whether he was a 'responsible person' under 26 U.S.C. §

---

[2] Colosimo adds an argument that he could not be responsible because he did not have the technical ability to pay over the taxes, as he lacked the capacity to use the software to do it and did not know the password.  But the technical capacity to pay over the taxes using a particular method is not the same as the effective authority to decide to pay the taxes.  See Barton, 988 F.2d at 59 (counseling against reliance on "mechanical functions").

6671(b)." Godfrey, 748 F.2d at 1576 (citation omitted). Therefore, Colosimo's argument that he did not know of the unpaid taxes is irrelevant to whether he was a responsible person.

Moreover, Colosimo's argument appears to be simply incorrect on its face. Colosimo says he "did not have the effective power to pay the trust fund taxes, as he was divested of that power by Andrew Gillaspey." But all the evidence indicates that Colosimo did have the effective power to pay the trust fund taxes. Armed with the power to fire employees, Colosimo had access to the books, knew of the payroll tax withholding and remitting requirements and, at best, turned a blind eye to what should have been an obvious problem. Colosimo's complaint that "nothing he could have done could change what occurred" is simply incorrect according to the evidence before the court.

"Although he may have delegated to [his subordinate] certain responsibilities relating to the operation of the [company], that delegation did not divest [the superior] of the ultimate authority to prevent the [company's] default in payment of the taxes. The fact that [the superior] chose not to fully exercise that authority is not determinative." Keller v. United States, 46 F.3d 851, 854 (8th Cir. 1995). Colosimo, who had "the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations", Jefferson v. United States, 546 F.3d 477, 481 (7th Cir. 2008), cannot assert he is not responsible simply because he did not exercise this power with enough attention and supervision to prevent employee misconduct and his resulting ignorance of unpaid tax liability. Colosimo was not deprived of his power and authority to collect and pay over federal withholding taxes by the misconduct of his subordinate. See also Purcell v. United States, 1 F.3d 932, 937 (9th Cir. 1993) (upholding grant of directed verdict for government on issue of responsibility against officer's argument that delegation of financial matters to embezzling subordinate relieved him of responsibility).

The court finds that Colosimo was a responsible person as a matter of law.

*2. Whether Colosimo willfully failed to pay over the taxes*

A person willfully fails to pay over taxes if he "acts or fails to act consciously and voluntarily and with knowledge or intent that as a result of his action or inaction trust funds belonging to the government will not be paid over but will be used for other purposes, or by proceeding with a reckless disregard of a known or obvious risk that trust funds may not be remitted to the government." Ferguson, 484 F.3d at 1072-73 (quotation marks and citations omitted). "The term willfully does not connote a bad or evil motive, but rather means a voluntary, conscious, and intentional act, such as the payment of other creditors in preference to the United States." Honey, 963 F.2d at 1087 (citation omitted). "Although willfulness is usually a question of fact, evidence that the responsible person had knowledge of payments to other creditors, including employees, after he was aware of the failure to pay over withholding taxes is proof of willfulness as a matter of law." Honey, 963 F.2d at 1087 (citation omitted).

Viewing the facts in the light most favorable to Colosimo, he did not know of any unpaid tax liability prior to June 2004. Therefore, during that time period he could not have willfully failed to pay the taxes.[3] However, the undisputed facts show that Colosimo had knowledge of payments to other creditors after he was aware of the failure to pay over withholding taxes. It is undisputed that Colosimo knew of the unpaid taxes by June 4, 2004. It is also undisputed that between June 4, 2004 and Labor Day 2004, C&C Distribution disbursed funds totaling $902,084.99 to creditors other than the United States.

---

[3] This is true only under the facts viewed in the light most favorable to Colosimo. For purposes of Colosimo's cross-motion for summary judgment, the court, taking the facts in the light most favorable to the government, would be unable to find Colosimo not responsible as a matter of law even for the time period preceding June 2004, given the government's proffer of evidence that Colosimo had received notices from the IRS in 2003 concerning unpaid taxes. Indeed, given all the other evidence of Colosimo's active involvement in C&C Distribution, there is certainly, at the very least, a genuine issue of material fact as to whether Colosimo knew of the unpaid taxes before June 2004.

23

C&C Distribution made further large payments to creditors other than the United States after that time. Under any view of the facts, Colosimo knew about these payments. This evidence is proof of willfulness as a matter of law. Honey, 963 F.2d at 1087; see also Ferguson, 484 F.3d at 1073 (evidence of knowing payments to other creditors with knowledge of unpaid taxes supports finding of willfulness); Jenson, 23 F.3d at 1395 (evidence that after learning of tax liability officer voluntarily and consciously chose to pay certain creditors before the IRS is sufficient to establish willfulness as a matter of law).

Against this, Colosimo argues that after June 2004 he was still not willful in failing to pay over the taxes to the government "due to the substantial and significant encumbrances imposed upon receivable funds by creditors of C&C Distribution." If C&C Distribution's funds were encumbered, then Colosimo could not have willfully failed to pay the taxes. See generally Honey, 963 F.2d at 1088-90. The government argues that none of C&C Distribution's funds were encumbered.

"Where the taxpayer's discretion in the use of funds is subject to restrictions imposed by a creditor holding a security interest in the funds which is superior to any interest claimed by the IRS, the funds are regarded as encumbered if those restrictions preclude the taxpayer from using the funds to pay the trust fund taxes." Honey, 963 F.2d at 1090 (quoting In re Premo, 116 B.R. 515 (Bankr. E.D. Mich. 1990)). "The essential point of this definition is that funds are encumbered only where the taxpayer is legally obligated to use the funds for a purpose other than satisfying the preexisting employment tax liability and if that legal obligation is superior to the interest of the IRS in the funds." Id. The "taxpayer has the burden to prove that all potentially available funds were encumbered." Id. at 1087 (citation omitted).

Colosimo argues that C&C Distribution funds were encumbered by State Savings Bank, C&C Realty, and West Bank, a lender of C&C Realty. Colosimo points to C&C Distribution's debt of over $460,000 to State Savings Bank, secured by a Security

Agreement. But nothing in the Security Agreement prevented C&C Distribution from using funds in its accounts to pay debts to creditors, and this is exactly what C&C Distribution did in disbursing funds throughout 2004 and 2005.[4] Nothing in the Agreement imposed restrictions on C&C Distribution's ability to use its funds to pay taxes. Moreover, a State Savings Bank employee stated that he oversaw C&C Distribution's loans from the bank and that the bank never restricted C&C Distribution's payment of taxes.

Colosimo also points to C&C Distribution's debt to C&C Realty of over $600,000 for back rent. But Colosimo co-owns C&C Realty with Carolyn; Colosimo is essentially asking the court to find that Colosimo's other company properly restricted his first company from paying its taxes. Moreover, Colosimo provides virtually no evidence that C&C Realty restricted C&C Distribution from using funds to pay trust fund taxes. Colosimo similarly provides no evidence that any lender of C&C Realty restricted C&C Distribution from using funds to pay trust fund taxes.

In addition, at their depositions, neither Colosimo nor Gillaspey could recall State Savings Bank imposing any limitation on C&C Distribution's ability to pay its federal taxes. Colosimo additionally testified that he did not recall any other bank imposing such a limitation. Colosimo and Gillaspey later submitted affidavits contradicting this testimony. This post hoc attempt to rationalize Colosimo's failure to pay over the taxes will not save Colosimo from summary judgment here. The court finds that Colosimo willfully failed to pay over the trust fund taxes as a matter of law.

Colosimo's motion for summary judgment is denied.

The government's motion for summary judgment against Charles Colosimo is granted.

---

[4] Indeed, it also appears from the evidence before the court that the majority of these funds went to creditors other than those that Colosimo claims limited C&C Distribution's ability to pay its trust fund taxes.

25

## V. CONCLUSION

Carolyn's motion for summary judgment [Dkt. 12] is granted; Carolyn's request for attorney's fees is denied. The counterclaim against Carolyn shall be dismissed. Colosimo's motion to strike [Dkt. 24] and motion for summary judgment [Dkt. 18] are denied. The government's motion for summary judgment against Colosimo [Dkt. 19] is granted. Colosimo's claim against the government is dismissed. The clerk shall enter judgment for the government on its counterclaim against Colosimo in the amount of $696,936.66 with statutory interest from December 1, 2009.

**IT IS SO ORDERED.**

**DATED** this 16th day of February, 2010.

JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA